UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
CHERYL E. FARB, HAROLD NEWMAN,

                                   Plaintiffs,           <u>MEMORANDUM</u>
                                                           <u>OPINION AND ORDER</u>

                  -against-                           CV 05-0596 (JS) (ETB)

BALDWIN UNION FREE SCHOOL DISTRICT,
BALDWIN UNION FREE SCHOOL DISTRICT
BOARD OF EDUCATION, JAMES BROWN,
in his official capacity as principal and individually,
ARLENE GUERRERO, in her official capacity as
Assistant Principal and individually, and DR. LEE
CHAPMAN, in his former official capacity as
Deputy Superintendent and individually,

                                     Defendants.
------------------------------------------------------------------------X

        Before the Court is attorney Thomas F. Liotti's Motion for Attorneys' Fees. On February 2,

2005, Plaintiffs Cheryl E. Farb and Harold R. Newman, through their then-counsel Liotti, filed this

suit asserting causes of action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§§ 2000-e <u>et seq.</u>; causes of action under 42 U.S.C. §§ 1981 and 1983; and various state law tort

claims.  Liotti was to be paid pursuant to a contingency fee agreement.  On April 5, 2005, Liotti was

terminated as counsel of record for plaintiffs and filed a Notice of Lien of Outgoing Attorney.  The

trial on the underlying action resulted in a jury verdict in plaintiffs' favor.  The District Judge

reduced the jury's award of damages and the parties subsequently settled the case.  Thereafter, Liotti

filed the instant Motion asserting that he is entitled to attorneys' fees for his earlier representation

in the matter.  Plaintiffs oppose the Motion, arguing that Liotti was discharged for cause and is

therefore not entitled to attorneys' fees.  An evidentiary hearing was held on May 26, 2011, at which

the following witnesses testified: (1) Jamel Oeser-Sweat, Esq., an attorney formerly employed by the Law Offices of Thomas F. Liotti; (2) Lucia Maria Ciaravino, Esq., an attorney currently employed by the Law Offices of Thomas F. Liotti; and (3) Thomas F. Liotti, Esq., each testified on behalf of Liotti; plaintiff Cheryl E. Farb testified on behalf of herself and co-plaintiff Newman. The parties have consented to the jurisdiction of the undersigned magistrate judge for the purposes of this Motion. For the reasons that follow, Liotti is not entitled to compensation for his representation of plaintiffs.

<sub>FINDINGS OF FACT</sub>

I.    Facts and Procedural History of Underlying Case

Plaintiff Farb was employed as a dean at Baldwin Middle School in the Baldwin Union Free School District ("School District"). (Tr. 159). She shared the job with her co-dean, Alvis Brown. (Tr. 71-72). After Farb filed a sexual harassment and discrimination complaint with the assistant superintendent of the School District, she was referred by a family friend to Liotti. (Tr. 161, 174-75). On January 21, 2004, the Law Offices of Thomas F. Liotti filed a Notice of Claim against the School District on behalf of Farb and Newman alleging various civil rights violations and state law torts. (SUF ¶ 2; Exh. 5). On January 22, 2004, Farb signed a retainer agreement with the Law Offices of Thomas F. Liotti to represent her in a potential action against the School District and James Brown, Principal of Baldwin Middle School. (Proposed Stipulation of Undisputed Facts[1] ("SUF") ¶ 1; Tr.

----

[1]Liotti submitted a Proposed Stipulation of Undisputed Facts prior to the hearing. At the hearing, counsel for Farb agreed to stipulate as to the facts included in the proposal, with a single objection to a paragraph asserting that plaintiff Newman took the file for the Farb matter from Liotti's Office without permission. Specifically, paragraph 5 of the Proposed Stipulation states, "Mr. Newman left the law firm and took the entire file with him without Mr. Liotti's

160-63; Hearing Exhibit ("Exh.") 2; Exh. 3). Liotti was to be paid on a contingency basis, receiving one-third of the amount recovered in the action. (Exhs. 2, 3). At some point after Liotti was retained, he hired Farb's husband, plaintiff Newman, as an associate attorney at the law firm, but assured Farb that Newman would not work on her case. (SUF ¶ 3; Tr. 165-66). Farb was eventually fired from her position at the school. (Tr. 160-61).

On June 9, 2004, Oeser-Sweat represented Farb at a hearing held pursuant to New York State General Municipal Law section 50-h, which allows a municipal defendant, including a school district, to examine a claimant who has filed a notice of claim against it. See N.Y. Gen. Mun. Law § 50-h; (Exh. 6, at 1-3; Tr. 17). Personnel at the Law Offices of Thomas F. Liotti also drafted and filed a complaint on behalf of Farb with the New York State Commission on Human Rights, claiming Farb was discriminated against on the basis of sex and race, as well as retaliated against for her opposition to such discrimination. (Tr. 22-23, 49-51; Exh. 7).

At some point, Farb informed Alvis Brown, her co-dean at the school, that she was being represented in a legal action by Liotti. (Tr. 181, 187-88). On June 30, 2004, Alvis Brown retained Liotti to represent him in a discrimination action against the School District. (Exh. 25; Tr. 168-69, 182). The Alvis Brown case was treated as a "companion case" to the Farb matter because Farb and Brown had experienced similar problems with the School District. (Tr. 70-71). Alvis Brown testified as a plaintiffs' witness in the trial of Farb's underlying action. (Tr. 78).

The Complaint in the instant case was filed on February 2, 2005. (Exh. 12). It included claims for sexual and racial harassment; religious discrimination; intentional infliction of emotional

permission." (SUF ¶ 5). Farb objected to the final five words of the paragraph. (Transcript of May 26, 2011 Hearing ("Tr.") 4). The Court will treat the remainder of the Proposed Stipulation as a joint Stipulation of Undisputed Facts.

distress; negligent infliction of emotional distress; defamation; retaliation by a public employer for whistleblowing; tortious interference with contract; and, on behalf of Newman, loss of consortium. (Id.). It named as defendants the School District, the School District's Board of Education, and four School District employees: James Brown, Arlene Guerrero, Kathy Weiss, and Lee Chapman. (Id.).

On or about March 6, 2005, Farb and Newman discharged Liotti, and Newman quit his job with the firm, taking the case file with him without Liotti's consent. (Tr. 101; Exh. 21). Liotti objected to the removal of the file. (Exh. 21). On March 17, 2005, Farb, Newman, and Liotti executed a Consent to Change Attorney form. (Exhs. 13, 14; Tr. 196). On April 5, 2005, Liotti was ordered terminated as attorney of record and Newman became attorney of record. (Exh. 13). On the same date, Newman was ordered terminated as attorney of record and Fred P. Bennett was substituted. (Id.). Thereafter, Liotti filed a Notice of Lien of Outgoing Attorneys with this Court. (Exh. 15).

Defendants filed a Motion to Dismiss, which the District Court granted in part on March 3, 2006. The Court first asserted that the Complaint's "lack [of] clarity and structure" hindered resolution of the motion. Memorandum and Order at 7, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Mar. 3, 2006), ECF No. 37. The District Court then dismissed (1) the Title VII claims against the individual defendants, noting that it is well-established in the Second Circuit that individuals are not subject to liability under Title VII, see id. at 7-8; (2) the religious discrimination claim, pointing out that the Complaint mentioned Farb's religion only once and "did not allege any facts giving rise to an inference that the harassing conduct directed at Farb was because of her religion," id. at 9; (3) the §§ 1981 and 1983 claims against defendant Weiss in her individual capacity, noting that the Complaint was not clear as to whether all individual defendants were even

charged under the sections, see id.; (4) all of plaintiff's emotional distress claims except for those against James Brown, see id. at 15-18; (5) the defamation claim, see id. at 23, 24; (6) the claim under New York's Whistleblower statute, noting that only equitable remedies were available under the statute and plaintiff failed to seek such remedies, see id. at 24-26; and (7) a respondeat superior "cause of action," emphasizing that it is not a cause of action but a theory of liability, see id. at 27.

On March 30, 2006, plaintiffs, through attorney Bennett, filed an Amended Complaint, which Liotti's firm did not prepare. (See Tr. 109; Exh. 20). The Amended Complaint alleged sexual harassment and racial discrimination against the School District, Board of Education, James Brown, Guerrero, and Chapman; intentional and negligent infliction of emotional distress against James Brown; tortious interference with contract against all defendants; and, on behalf of Newman, a claim against James Brown for loss of consortium. (Exh. 20). Bennett was later removed and Leeds, Morelli & Brown was substituted with Rick Ostrove serving as lead attorney for plaintiffs. (Exh. 13).

As the trial neared, plaintiffs' attorney Ostrove approached attorney Ciaravino, who was assigned to the Alvis Brown case, to ask whether Alvis Brown would testify as a witness on Farb's behalf. (Tr. 70, 75-76). The trial began on April 27, 2009. See Minute Entry, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Apr. 27, 2009), ECF No. 114. Alvis Brown ultimately testified on behalf of Farb. (Tr. 78). A jury awarded Farb $4 million in compensatory damages and $1 million in punitive damages, and awarded Newman $250,000 for his loss of consortium claim. See Memorandum & Order at 4, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Feb. 3, 2010), ECF No. 157. The Court reduced to $500,000 the jury's award of $4 million in compensatory

damages on plaintiffs' Title VII retaliation claim[2] and intentional infliction of emotional distress claim, finding that the award exceeded the statutory maximum for Title VII damages against employers with more than 500 employees, and that the award was excessive for the intentional infliction of emotional distress claim.  See id. at 11-16.  The Court also found the $1 million punitive damages award excessive, ruling that $500,000 was a sufficient punitive damages award.  See id. at 19.  The Court thus reduced the damages to $1.25 million in a conditional remittitur.  See id. at 4, 19 & n. 5.  The case eventually settled for $1.6 million.  (Tr. 116).

II.    Motion for Attorneys' Fees and Hearing

On January 26, 2011, Liotti filed the instant Motion.  The Motion asserts that Liotti's firm performed various legal services in connection with the Farb matter, such as drafting correspondence, press releases, and various legal papers, including the original Complaint in this action; attending Farb's 50-h hearing; and cooperating with Farb's trial counsel by helping to prepare Alvis Brown for his testimony in the trial.  (See Affirmation in Support of Motion ("Liotti Aff.") at 3-5).  Liotti states that his firm "devoted 127.05 hours" to the matter (Liotti Aff. at 3) and supports this number with a document purporting to be a record of legal services the firm performed (see Motion, Exh. E).  As compensation, Liotti asks for one-third of the total attorneys' fees awarded in the action.[3]  (Motion at 2; Liotti Aff. at 2).  Plaintiffs' opposition asserts that Liotti was discharged

---

[2]The Court noted that a retaliation claim was not included in the Amended Complaint, but nevertheless instructed the jury on the issue after listening to the evidence presented at trial.  See Memorandum & Order at 11, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Feb. 3, 2010).

[3]The Motion requests a percentage of the attorneys' fees already recovered in the action. However, in Liotti's Reply in Opposition to Plaintiffs' Proposed Findings of Fact and

for cause and is therefore not entitled to attorneys' fees.  (See Plaintiffs' Memorandum of Law in Opposition to Mr. Liotti's Re-Filed Motion ("Opp.") at 2-3).

As noted above, an evidentiary hearing was held on May 26, 2011.  Oeser-Sweat, an attorney formerly employed by Liotti's firm, Ciaravino, an attorney employed there, and Liotti testified on Liotti's behalf.  Farb testified on behalf of herself and co-plaintiff Newman.

A.     Alan Ansell

Alan Ansell is a former attorney who was suspended in 1991 by the Appellate Division, Second Judicial Department, for five years for neglect of numerous actions and subsequent attempts to conceal the neglect from his clients, as well as failure to cooperate with investigations into his neglect.  See In re Ansell, 572 N.Y.S.2d 366, 366-68 (App. Div. 1991).  In 1995, Ansell was disbarred when he defaulted in proceedings charging him with further professional misconduct, including "conduct involving dishonesty, fraud, deceit, and misrepresentation."  In re Ansell, 628 N.Y.S.2d 604, 604-05 (App. Div. 1995).  Like the order suspending Ansell, the order disbarring him prohibited him from "practicing law in any form, either as principal or as agent, clerk, or employee of another" and from "giving to another an opinion as to the law or its application or any advice in relation thereto," among other restraints.  In re Ansell, 572 N.Y.S.2d at 368; In re Ansell, 628 N.Y.S.2d at 605.  All of this, of course, is a matter of public record.  The relevant period of time that

Conclusions of Law ("Reply"), which was filed after the hearing, Liotti seeks $186,666.00 in quantum meruit attorneys' fees and $20,000 in sanctions against plaintiffs for asserting a meritless defense to Liotti's application, for a total award of $208,176.08.  (See Reply at 35). The sanction was raised for the first time on Liotti's post-hearing Reply and as such will not be recognized by the Court.  See, e.g., Wong v. Yoo, 649 F. Supp. 2d 34, 76 (E.D.N.Y. 2009) (issues raised for the first time in a reply brief need not be considered).  Moreover, given the outcome of this proceeding, the request is devoid of any merit.

Farb and Newman were represented by Liotti is from January 21, 2004, until March 6, 2005. (See Exhs. 5, 21).

At the time that Liotti employed Ansell as a law clerk in his office, Liotti knew that Ansell was not a member of the bar. (See Tr. 142-43; see also Proposed Findings of Fact and Conclusions of Law ("Liotti's Proposed Findings") at 13). Specifically, Liotti stated, "I was under the impression, because he told me this, that he had just been suspended. And for whatever reason had not reapplied for admission. And the suspension, which was documented, had ended." (Tr. 142). Liotti further asserted that he did not find out until late 2005 that Ansell had been disbarred. (Tr. 142). However, an affidavit by Ansell, which Liotti submitted to the Court after the evidentiary hearing, states that Ansell informed Liotti of his disbarment at the end of 2004. (See Liotti's Proposed Findings, Exh. C ("Ansell Aff.") at 2). Between the conflicting evidence in the record before me, I credit the Ansell affidavit on the issue of when Liotti was informed. Oeser-Sweat testified that while he was employed at Liotti's firm he "heard some rumbling" that Ansell had been disbarred. (Tr. 56). Liotti further acknowledged that his research showed that, "a disbarred lawyer certainly should not work in a law office. A suspended lawyer probably shouldn't either. But . . . [two] bar associations in their opinions said that the disbarred or suspended lawyer in any event should not have contact with clients." (Tr. 142-43). Liotti argues that when he learned of the disbarment, he "began to sever" his employment relationship with Ansell. (Liotti's Proposed Findings at 13). It is not disputed that Ansell remained affiliated with Liotti at the time of the latter's discharge in early March 2005.

It is undisputed that, under the auspices of Liotti's firm, Ansell performed legal work on Farb's case. Farb testified that Ansell was the "attorney [sic] that [she] dealt with most in th[e] office." (Tr. 164). She "spoke with him quite often"–"almost all the time" (Tr. 164)–and related

the facts of her case to him (see Tr. 167, 172). Ansell expressed his opinion about how she should proceed with her case and prepared documents on her behalf. (See Tr. 173). Ansell prepared her for the 50-h hearing. (Id.). Indeed, Farb testified that Ansell was "the only one [she] was working with." (Tr. 172). The Court credits this testimony by plaintiff Farb. Additionally, although Oeser-Sweat failed to mention Ansell's employment with the firm on direct examination, on cross-examination he stated that Ansell worked as a clerk on the Farb matter and specifically noted that Ansell would "absolutely" have reviewed the Complaint and "probably" offered opinions on it. (Tr. 55).

Thus, the credible evidence shows that Liotti hired disbarred attorney Ansell, whom he believed was suspended and not reinstated, and that Ansell performed substantial legal work on matters including the Farb litigation. The evidence further shows that Ansell worked on the Farb matter under the auspices of Liotti's firm notwithstanding Liotti's knowledge of Ansell's suspension and disbarment. It is further undisputed that Liotti did not inform Farb that Ansell had been suspended or disbarred; rather, she found out from her husband sometime prior to the end of 2009.[4] (Tr. 204-207).

B.    Inconsistencies in Exhibit 16 and Testimony by Liotti and Oeser-Sweat

The extent of Ansell's work on the case is also supported by documentary evidence introduced by Liotti at the hearing. Exhibit 16 is a document dated July 23, 2009, which is a

_____

[4]After plaintiffs fired Liotti, Ansell continued to work on the matter with plaintiffs' next attorney, Bennett, and thereafter until plaintiffs hired Ostrove to represent them in July 2008. (See Tr. 202-04, 207); see also Notice of Appearance, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (July 30, 2008), ECF No. 97. Ostrove did not represent plaintiffs at the evidentiary hearing, having been substituted by Jeffrey Alan Hoerter on April 27, 2011.

"summary" of the work performed by Liotti's firm on the Farb case. (Tr. 101-02). Both Liotti and Oeser-Sweat testified that not all of the work performed is reflected on the document. (See Tr. 31, 102). Liotti testified at the hearing that the handwritten time sheets upon which the firm's timekeeping were based were "probably" "in storage in the basement of [his] office," but that it would "involve a great deal of work and time and everything else" and a "tremendous search," which would be "useless and unnecessary," to find and evaluate them. (Tr. 103-04, 130-31, 153). For this reason, Liotti failed to produce these records.

Exhibit 16 is a record of time expended on the case, including the date of work, a description of the task, the amount of time spent on the task, and the person performing the task. Liotti is represented by a "T" on the document; one or more law clerks are represented by an "LC" on the document; and one or more paralegals are represented by a "PL" on the document. Exhibit 16 reflects that these timekeepers performed work on the matter. (See Exh. 16 at 6). The document also mentions Oeser-Sweat and Newman as having participated in the case. (See id. at 2-6).

As noted above, Ansell worked as a law clerk at Liotti's firm during the relevant period. (Tr. 143). Farb testified that she worked extensively with Ansell on the case, speaking with him regularly. (Tr. 164). Exhibit 16 shows that a law clerk performed over 25 hours of work on the case between January 29, 2003, and February 15, 2005, for which Liotti seeks payment. (See Exh. 16). These tasks included meeting with plaintiffs to review the facts of the case, performing legal research and drafting court documents, and fielding numerous telephone calls from Farb. (See id.). For example, within the first few months of Liotti's representation, an unnamed law clerk met with Farb and Newman twice (on January 29 and May 8) and had six telephone conferences with Farb (one on February 26, three on March 16, one on April 21, and one on May 4). (See id. at 1-2). Moreover,

an unnamed law clerk reviewed and revised parts of the Complaint, including the facts section. (See id. at 5). In short, a law clerk is listed as performing the tasks that Farb asserted Ansell performed. When questioned at the hearing, Liotti acknowledged that Ansell "might be one of the LCs" listed on Exhibit 16. (Tr. 143). Indeed, unrebutted testimony, in tandem with Exhibit 16, shows that Ansell performed significant legal work on the Farb matter while he was employed at Liotti's firm.

Exhibit 16 also shows that plaintiff Newman worked as an attorney on the Farb matter. Although he is not an identified timekeeper on the document, he is mentioned as a participant in a number of conferences. For example, a June 15, 2004 entry reads, "Conference with Harry Newman regarding Alvis Brown." (Exh. 16 at 2). On August 17, 2004, Newman and the law clerk had a telephone conference with a witness. (See id., at 3). Newman also participated in the preparation of legal documents, such as a filing with the Equal Employment Opportunity Commission (see id. at 4 (entry for Oct. 27, 2004)) and the Complaint. (See id. at 5-6 (entries for Dec. 28, 2004; Jan. 10, 2005; Jan. 26, 2005; Jan. 27, 2005; and Feb. 2, 2005); see also Tr. 20). This work occurred even though undisputed testimony by Farb established that Liotti assured her that her husband would not work on their case and that Liotti would handle it himself. (Tr. 165-66).

Exhibit 16 becomes more troublesome when examined in light of the other evidence submitted at the hearing, much of which is uncontested. According to Exhibit 16, Liotti accrued the bulk of the 127.05 hours expended on the Farb matter. Indeed, 94.1 hours–nearly 75% of the hours listed–are ascribed to Liotti. (See Exh. 16). Liotti asserted at the hearing that he was scrupulous about keeping track of his time, stating, "I have to say, it is my firm. I'm pretty religious about it because it's my money." (Tr. 128). Exhibit 16 shows that Liotti's tasks included legal research;

drafting correspondence; attending Farb's 50-h hearing; drafting and reviewing court documents, such as the Complaint; and filing and serving the Complaint. (See Exh. 16).

Notwithstanding Liotti's assertedly meticulous time-keeping and his affirmation of the accuracy of the document (see Tr. 123, 153), the exhibit is clearly inaccurate and unreliable as a record of the tasks performed and time spent by Liotti on the Farb matter. For example, according to the document, Liotti spent 18.8 hours researching, revising, and drafting the Complaint. (See Exh. 16 at 5). With the exception of Newman, who is described as having reviewed the facts section with the law clerk, no other attorney is listed as having expended time on the Complaint. (See id.). However, Oeser-Sweat testified that he drafted the Complaint: "I played the majority of the role. It was probably, to the best of my recollection, it was my complaint. I did draft it." (Tr. 20). Oeser-Sweat stated that he received assistance from paralegals and from Newman. (Tr. 20). However, he fails to mention that Liotti played any role in the drafting of the Complaint, let alone that Liotti did the bulk of the work.[5] A post-hearing submission by Liotti seems to admit that Oeser-Sweat took the lead in drafting and revising the Complaint, asserting that Liotti's firm should be compensated for the time Oeser Sweat "spent drafting the Summons and Complaint [and] . . . spent reviewing and making revisions to the Summons and Complaint." (Reply at 13). In a similar inconsistency, Exhibit 16 shows that Liotti spent 7.6 hours preparing for and attending Farb's 50-h hearing. (See Exh. 16 at 2). Oeser-Sweat testified that he "prepared for the 50-h hearing" and "subsequently appeared at the hearing where Ms. Farb was questioned for the majority of the day, maybe six or

_____

[5]Until pressed to admit that Ansell worked on the Complaint (see Tr. 55), Oeser-Sweat also failed to mention that a law clerk assisted him, although Exhibit 16 reflects that one or more law clerks performed 8.75 hours of work on the Complaint, almost one-third of the total hours billed to its preparation. (See Exh. 16 at 5).

seven hours." (Tr. 17). Oeser-Sweat also testified that Liotti was not present at the 50-h hearing (see Tr. 48), a fact which is borne out by the transcript of the hearing, which reveals that only Oeser-Sweat appeared for Farb. (See Exh. 6 at 2). Liotti acknowledged–as he must–that he did not appear at the 50-h hearing. When presented on cross-examination with the entries from Exhibit 16 (time records) regarding the 50-h hearing, he asserted that he did not actually attend, concluding, "So why that would indicate Tom [Liotti] and not Jamel [Oeser-Sweat], I don't know." (Tr. 137). And in a post-hearing submission, he asserts that Oeser-Sweat "prepared for and accompanied Ms. Farb to a General Municipal Law § 50-h hearing," which "lasted seven (7) hours." (Reply at 12; see also id. at 13). Moreover, Exhibit 16 shows that Liotti, himself, filed the Complaint in this Court on February 2, 2005. (See Exh. 16 at 5). Plaintiffs submitted conclusive evidence that established that Newman filed the Complaint and paid the filing fee on the date in question. (See Exh. C).

Other testimony elicited by Liotti at the hearing further disputes that Liotti performed the majority of the work on the Farb matter. Oeser-Sweat testified that he was the "primary attorney" on the case, with Liotti "basically supervis[ing]." (Tr. 18; see also Tr. 19 ("To the best of my recollection, just like any other case, [Liotti's] role is supervisory."). Farb testified that Liotti was almost completely unavailable to her. (See Tr. 163 ("I did try to contact Mr. Liotti. He was often not available for me. I tried to go to the office. He was not available."); 166 ("Because I was concerned, I was not getting hold of Mr. Liotti."); 172-73 ("I tried many times to talk to Mr. Liotti about my concerns, and ask questions to meet with him. And I never got anything, any response from him."); 173 ("I didn't talk to Mr. Liotti. He didn't return calls to me. He didn't answer questions for me."); 184 ("Towards the end when I was trying to terminate Mr. Liotti, I did send him – we were conversing through emails, and I did tell him the reasons why I was terminating him. And

I actually had tried to go to his office, and he wouldn't see me. He refused to see me."). In a letter to Farb that post-dates his discharge, Liotti implicitly acknowledges that he performed little legal work on the case: Liotti states that he paid others (including law clerks) to work on the case, while he "review[ed] . . . paperwork and also arranged for press conferences and responded to other media contacts . . . ." (Exh. 21 at 3).

Moreover, even taken alone without reference to hearing testimony, Exhibit 16 is replete with internal inconsistencies which undermine its accuracy as a record of Liotti's time. For example, Liotti bills time for writing memos to himself. (See Exh. 16 at 2 (entry for June 15, 2004). There are multiple entries in which Liotti bills time for conferences with himself. (See, e.g., Exh. 16 at 2 (entries for June 3, June 7, and June 9, 2004). In short, this document is rife with absurdities. It cannot be relied on as a record of Liotti's time, and it undermines the testimony of both Liotti and Oeser-Sweat.

Notwithstanding Oeser-Sweat's testimony that he was the primary attorney assigned to Farb, as noted, Exhibit 16 does not record Oeser-Sweat as a timekeeper on the matter. Indeed, he is mentioned only once, in a May 14, 2004 entry that seems to memorialize a 12-minute meeting among Liotti, Oeser-Sweat, and a law clerk. (See Exh. 16 at 2). Oeser-Sweat testified that attorneys at Liotti's firm "didn't always keep track of the time" they spent on contingency cases. (Tr. 48). While he did "keep notations of the hours . . . devoted to the Farb matter," he opined that the majority of his time was probably not documented "because it was a contingency matter." (Tr. 31). Oeser-Sweat worked on the case from "its inception" (Tr. 15) and estimated that he devoted "[a] couple of hundred" hours to the matter. (Tr. 31). Oeser-Sweat's estimate is neither reliable nor plausible. He asserted he arrived at the figure by assuming that he spent at least 15 minutes on the

case per day for a year-and-a-half.[6] (Tr. 53). Moreover, Oeser-Sweat's testimony regarding his work on the case is contradicted by other testimony and documentary evidence. While it is clear that Oeser-Sweat represented Farb at the 50-h hearing and played a role in drafting the Complaint, he also claimed that he had met with Farb "six or seven" times. (Tr. 53). Farb, however, testified that she never dealt with Oeser-Sweat and she met him only once–at the 50-h hearing. (Tr. 165, 170). In addition, Oeser-Sweat asserted that he was the primary attorney on the case during his time at Liotti's firm. (Tr. 17). But in a letter to Farb, Liotti asserted that he reduced Oeser-Sweat's role in the case after plaintiffs "expressed dissatisfaction" with him, bringing in Newman and law clerks to work on the case. (Exh. 21 at 3). Thus, Oeser-Sweat grossly overestimates the time he spent on the case and his role while the case was with Liotti.

Liotti insists that Exhibit 16 is an accurate record of the time entered into his firm's computers on the Farb matter. At the hearing, in response to the Court's observation that the document seemed a "reconstruction" made after the fact, Liotti answered, "No, not quite. Let me explain, if I can. This is accurate as to the time that was put into our computer in '04 and '05 . . . . It is not a reconstruction." (Tr. 103). Later, he asserted that the document "is a business record kept in the normal course of business. And I will testify that I am the custodian and keeper of those records and I attest to their accuracy." (Tr. 123). Even during his cross-examination, after having been questioned about inconsistencies in the document, he insisted that the entries on Exhibit 16 "were the accurate records . . . , together with Mr. Sweat's testimony" of the hours expended on the Farb matter. (Tr. 153). He repeated that assertion in post-hearing submissions, stating that "Exhibit

---

[6] If Oeser-Sweat spent 15 minutes per day on the case every day, including weekends, from January 21, 2004 until March 6, 2005, a period of 411 days, that figure would only be about 102 hours.

16 reflected the actual time input into [the] computer in 2004 and 2005."  (Liotti's Proposed Findings of Fact at 16).

C.      Alvis Brown

It is undisputed that Liotti represented Alvis Brown and Farb simultaneously in their separate discrimination actions against the School District.  (See Tr. 27-28; 71; Exhs 25 & 26).  It is also undisputed that Alvis Brown was not named as a defendant or respondent in any of Farb's complaints. (Tr. 176; 189; 192; 195; Exhs. 5, 7, 12).  Indeed, Farb testified in her 50-h hearing that she and Alvis Brown began to feel "like it was us against [the other school administrators]," and that she did not think that Alvis Brown was harassing her; rather she thought "that he was as fearful as I was." (Exh. 6 at 28, 185-86).  However, at the attorneys' fees hearing, Farb testified that she was uncomfortable that Liotti's firm was representing Alvis Brown because he had participated in the harassment that was the subject of her suit.  (Tr. 167-69, 173-74; 198).  Farb asserted that she told Ansell "about the position Mr. Alvis Brown would put [her] in, in relation to working with the principal," defendant James Brown, by "disappear[ing] from his office for many hours, leaving me in charge and responsible for dealing with all of the [2400] children in that school." (Tr. 167).  She also asserted that Alvis Brown, who was in charge of the school's security guards, "had the security guards writing up letters that would subsequently be given to the principal and placed in [her] personnel file." (Tr. 167-68; 210).

III.    Liotti's Files from the Farb Matter

In connection with the Motion for Attorneys' Fees, Ostrove, who was plaintiff's attorney at

the time, offered to allow Liotti to examine five litigation boxes of files which assertedly include the remainder of Liotti's files regarding the Farb litigation. (Tr. 93). Liotti declined the opportunity to inspect the files. (Id.).

DISCUSSION

Liotti argues he is entitled to attorneys' fees because he was terminated without cause. (Liotti's Proposed Findings at 11). Plaintiffs, however, assert that Liotti was discharged for cause and has therefore forfeited his fees. (See Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Plaintiffs' Proposed Findings") at 11). The Court find that Liotti was discharged for cause and is not entitled to attorneys' fees.

I.      Legal Standards

Liotti's right to attorneys' fees is governed by New York law. See, e.g., Garcia v. Teitler, 443 F.3d 202, 211-12 (2d Cir. 2006) (applying New York law to the question of a discharged attorney's contractual right to fees); Casper v. Lew Lieberbaum & Co., 182 F. Supp. 2d 342, 346 (S.D.N.Y. 2002) (same). "Under New York law, an attorney may be dismissed by a client at any time with or without cause." Garcia, 443 F.3d at 211; see also Felix v. Law Office of Thomas F. Liotti, 25 Misc. 3d 1239(A), 2009 WL 4724684, at *2 (N.Y. Sup. Oct. 28, 2009). If an attorney is discharged for cause, "the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement." Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 44 (1990); see also Garcia, 443 F.3d at 211. Rather, a charging lien (like the one Liotti attempts to enforce) is enforceable only by an attorney discharged without cause. See Stair v. Calhoun, 722 F.

-17-

Supp.2d 258, 267 (E.D.N.Y. 2010) ("[A]ttorneys who terminate their representation are still entitled to enforce their charging liens, as long as the attorney . . . is not discharged for 'good cause.'"); Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York, 754 N.Y.S.2d 220, 223 (App. Div. 2002) (noting that a charging lien is a remedy available to an attorney who is discharged without cause). "Poor client relations, differences of opinion, or personality conflicts do not amount to cause . . . ." Garcia, 443 F.3d at 212. Instead, "[a]n attorney may be discharged for cause where he or she has engaged in misconduct, has failed to prosecute the client's case diligently, or has otherwise improperly handled the client's case or committed malpractice." Coccia v. Liotti, 896 N.Y.S.2d 90, 100 (App. Div. 2010); see also Allstate Ins. Co. v. Nandi, 258 F. Supp. 2d 309, 312 (S.D.N.Y. 2003) (noting that under New York law a discharge is for cause when there has been a significant breach of a legally or ethically imposed duty). "Misconduct that occurs before an attorney's discharge but is not discovered until after the discharge may serve as a basis for fee forfeiture." Coccia, 896 N.Y.S.2d at 100. It is the client's burden to establish that the attorney was discharged for valid cause. See DeLucia v. Village of Monroe, 580 N.Y.S.2d 91, 92 (App. Div. 1992); Williams v. Hertz Corp., 457 N.Y.S.2d 23, 25 (App. Div. 1982).

In a dispute between a client and an attorney who has been discharged without cause, however, the attorney is entitled to compensation on a quantum meruit basis for the reasonable value of his services, unless the client and attorney have agreed otherwise. Levy v. Laing, 843 N.Y.S.2d 542, 544 (N.Y. App. Div. 2007); see also Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C, 370 F.3d 259, 263 (2d Cir. 2004) ("'Recovery on a quantum meruit basis is called for . . . where the attorney discharged without fault was employed under a contingent fee contract.'"); Allstate Ins. Co., 258 F. Supp. 2d at 311-12. Under New York law, a court must consider various

factors in determining the reasonable value of the services rendered by the attorney, including "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the amount at issue, and the results obtained." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 148 (2d Cir. 1998); see also Smith v. Boscov's Dep't Store, 596 N.Y.S.2d 575, 576 (App. Div. 1993). The court may also take into account any contingency fee agreement that the attorney had with the client. See Ruggiero v. R.W. Gross Plumbing & Heating, Inc., 641 N.Y.S.2d 189, 191 (App. Div. 1996). Such an agreement is not, however, the dispositive factor. Smith, 596 N.Y.S.2d at 576. Importantly, the attorney has the burden of proving the amount of legal fees due from client and, in so proving, is "held to the highest standards" of proof. Estate of Jackson, 508 N.Y.S.2d 671, 676 (App. Div. 1986).

The Second Circuit has held that an application for attorneys' fees must be supported by contemporaneous time records, except in the rarest of cases. See Scott v. City of New York, Nos. 09-3943-cv, 09-5232-cv, — F.3d —, 2011 WL 1990806, at *2 (2d Cir. May 24, 2011); N. Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). However, that court has also recognized that, in cases in which the right to attorney fees is governed by state law, such as a contractual attorneys' fees case, New York's more liberal rule, which allows reconstructed records, should apply. See Riordan v. Nationwide Mutual Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1992) ("State law creates the substantive right to attorney's fees, a right which cannot be deprived by applying the contemporaneous time records rule adopted in this Circuit" (internal citations omitted)); see also Schwartz v. Chan, 142 F. Supp. 2d 325, 331 (E.D.N.Y. 2001) ("[U]nder New York law, courts may award attorney's fees based on contemporaneous or reconstructed time records."). Nonetheless, the burden is on the attorney claiming such fees to "keep and present

records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested."  F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1265 (2d Cir. 1987) (collecting New York state court cases); see also Estate of Jackson, 508 N.Y.S.2d at 676 (stating that attorneys are held to the highest standards of proof in fee disputes with clients); General Star Indemnity v. Custom Editions Upholstery, 940 F. Supp. 645, 653 (S.D.N.Y. 1996) ("[E]ven if contemporaneous records are not required, this court cannot rely on an admittedly 'speculative,' 'reconstructed hourly bill' to set compensation."); Dweck Law Firm v. Mann, No. 03 Civ. 8967, 2004 WL 1794486, at *3 (S.D.N.Y. Aug. 11, 2004) ("[B]ecause [the attorney] acknowledges that the total hours was nothing more than a 'guesstimate,' and because there are no records to support the testimony, a 25 percent discount of that guesstimate is appropriate.").

II.     Liotti Aided a Disbarred Attorney in the Practice of Law, Entitling Plaintiffs to Discharge Him for Cause

Only attorneys may practice law in New York.  See N.Y. Jud. Law §§ 478, 484.  "A suspended or disbarred attorney holds approximately the same status as one who has never been admitted . . . ."  In re Rosenbluth, 320 N.Y.S.2d 839, 840 (App. Div. 1971).  Thus, a suspended or disbarred attorney may not engage in the practice of law.  N.Y. Comp. Codes R. & Regs. tit. 22, § 691.10(e); see also Coccia, 896 N.Y.S.2d at 101.  "The practice of law involves the rendering of legal advice and opinions directed to particular clients."  In re Rowe, 80 N.Y.2d 336, 340 (1992); see also In re Roel, 3 N.Y.2d 224, 229 (1957) ("Whether a person gives advice as to New York law, Federal law, the law of a sister State, or the law of a foreign country, he is giving legal advice.

Likewise, when legal documents are prepared for a layman by a person in the business of preparing such documents, that person is practicing law . . . ."). Activities such as "preparing legal memoranda and documents to be filed in court"–even if signed by an admitted attorney–or conducting interviews with clients are forbidden to a suspended or disbarred lawyer. See In re McClain-Sewer, 907 N.Y.S.2d 485, 487 (App. Div. 2010) ("[R]espondent continued to perform substantial legal work . . . , preparing legal memoranda and documents to be filed in court . . . , and being compensated for that work through other attorneys in good standing under whose names that work was submitted."); In re Kuriakose, 576 N.Y.S.2d 293, 294-95 (App. Div. 1991) (holding that consulting with a client and preparing legal memoranda constitutes the practice of law).

Similarly, it is a violation of the ethical rules for an attorney in good standing to aid a suspended or disbarred attorney in continuing to practice law. See N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.16 ("A lawyer shall not aid a non-lawyer in the unauthorized practice of law."), superseded in 2009 by N.Y Comp. Codes R. & Regs. tit. 22, § 1200.0, Rule 5.5(b) ("A lawyer shall not aid a nonlawyer in the unauthorized practice of law.");[7] Coccia, 896 N.Y.S.2d at 101; In re Riely, 475 N.Y.S.2d 473, 474 (App. Div. 1984); Kuriakose, 576 N.Y.S.2d at 295 (disciplining an attorney for aiding a nonlawyer in consulting with and preparing legal papers for a client); DR 3-101(a) ("A lawyer shall not aid a non-lawyer in the unauthorized practice of law."). Indeed, an attorney can be suspended for doing so. See In re Takvorian, 670 N.Y.S.2d 211, 212-13 (App. Div. 1998) (suspending attorney for one year for providing false and misleading testimony and for aiding a non-

---

[7]The New York Code of Professional Responsibility was in effect when Liotti concurrently represented Farb and Alvis Brown. In 2009, the Code was superseded by the New York Rules of Professional Conduct. See e.g., Gabayzadeh v. Taylor, 639 F. Supp. 2d 298, 303 (E.D.N.Y. 2009).

lawyer in the practice of law). Such misconduct is grounds for discharging an attorney for cause.

See Coccia, 896 N.Y.S.2d at 100-01; see also Allstate Ins. Co., 258 F. Supp. 2d at 312 (noting that

the breach of an ethically imposed duty is grounds for discharge for cause).

The situation presented in the instant case is quite similar to the issues raised in Coccia v.

Liotti, a legal malpractice action brought against Liotti in state court. The plaintiff there claimed,

among other instances of alleged malpractice, that Liotti knowingly aided a disbarred attorney in the

practice of law. See Coccia, 896 N.Y.S.2d at 100-01. More specifically, the plaintiff in that case

complained that Liotti knew that Ansell was a suspended or disbarred attorney and nevertheless

allowed Ansell to work on her divorce case.[8] See Order at 4-5, 13, Coccia v. Liotti, Case No.

5195/06 (N.Y. Sup. Ct. Apr. 30, 2008), available at http://decisions.courts.state.ny.us/10jd/nassau/

decisions/index/ index_newlally/2008may/005195-06.pdf. On appeal, the Appellate Division noted

that the plaintiff alleged that Ansell met and consulted with her, drafted memos and notes, and was

more familiar with her case than was Liotti. Coccia, 896 N.Y.S.2d at 100. The court held that the

plaintiff had sufficiently alleged that Liotti knowingly aided Ansell in the practice of law, which

would constitute professional misconduct. Coccia, 896 N.Y.S.2d at 100-01.

I find that Ansell–suspended in 1991 and disbarred in 1995–worked on plaintiffs' case

throughout the time that plaintiffs were represented by Liotti's law firm–January 2004 through

March 2005. (Tr. 141-43; 173). Testimony that Ansell prepared documents in the case and

interviewed and provided legal advice to plaintiffs was unrebutted at the hearing. (Tr. 55; 173).

---

[8]The divorce action "was commenced on July 16, 2002." Order at 1, Coccia v. Liotti,
Case No. 5195/06 (N.Y. Sup. Ct. Apr. 30, 2008), available at http://decisions.courts.state.ny.us/
10jd/nassau/decisions/index/index_new/lally/2008may/005195-06.pdf. This state court action
likely is the source of the Ansell affidavit dated January 17, 2006, submitted by Liotti with his
Reply papers and discussed above.

Indeed, according to the testimony of plaintiff Farb, which I credit, Ansell was the "attorney" with whom she had the most contact in Liotti's office. (Tr. 164). Liotti asserts that Ansell "misrepresented his status to me stating that he was suspended but that his suspension period had ended and that he was eligible to apply for reinstatement." (Liotti's Proposed Findings at 13). The suspension order in the Ansell matter, dated July 22, 1991, which is a reported decision of the Appellate Division, clearly states that the suspension shall continue "until the further order of this court."[9] In re Ansell, 572 N.Y.S.2d at 368. I do not credit Liotti's claims of innocent involvement. Liotti states that, once he found out Ansell was disbarred, he researched whether such an attorney may be employed to perform research and legal writing, and, having discovered the answer, began to sever his relationship with Ansell. (Liotti's Proposed Findings at 13-14). It is clear that Liotti knew that Ansell had been suspended and was not reinstated, and that he allowed him to work on the Farb matter.[10] (Tr. 141-42). Moreover, the affidavit by Ansell–ironically submitted post-hearing by Liotti–establishes that Liotti was told by Ansell of his disbarment in late 2004. (See Ansell Aff. at 2); see In re Raskin, , 635 N.Y.S.2d 268, 269 (App. Div. 1995) (disciplinary action based on the intentional aiding of a non-lawyer in the practice of law). There is no dispute that Ansell continued to practice in Liotti's office until Liotti was terminated in March 2005. (See Tr. 202-24, 207). Nor is there any dispute that Ansell's suspension and/or disbarment was not disclosed to plaintiffs during

_____

[9]The suspension provision in Ansell states, in relevant part, "ORDERED that the respondent Alan Paul Ansell is suspended from the practice of law for a period of five years, commencing August 23,1991, and continuing until further order of this court . . . ." Id.

[10]Liotti testified at the hearing that his research revealed that "a disbarred lawyer certainly should not work in a law office. A suspended lawyer probably shouldn't either. But both bar associations in their opinions said that the disbarred or suspended lawyer in any event should not have contact with clients." (Tr. 142-43).

the time that Liotti represented them. Thus, the evidence clearly establishes that Liotti aided a suspended and disbarred attorney in the practice of law and allowed him to perform substantial legal work on the Farb and Newman action. This constitutes a substantial breach of a legal and ethical duty. See N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.16 ("A lawyer shall not aid a non-lawyer in the unauthorized practice of law."); DR 3-101(a) (same). As such, it constitutes good cause for termination, even though discovered after plaintiffs terminated Liotti's services. See Allstate Ins. Co., 258 F. Supp. 2d at 312 ("Courts typically find a discharge 'for cause' where there has been a significant breach of legal duty."); Coccia, 896 N.Y.S.2d at 100 ("Misconduct that occurs before an attorney's discharge but is not discovered until after the discharge may serve as a basis for fee forfeiture.").

III.     Liotti's Simultaneous Representation of Farb and Alvis Brown did not Constitute a Conflict of Interest

Plaintiffs assert that Liotti's concurrent representation of Farb and Alvis Brown constituted a conflict of interest, arguing that (1) Alvis Brown participated in the harassment of which Farb complained; (2) because Alvis Brown would be a likely witness in the Farb trial (and vice-versa), Liotti could not zealously advocate on behalf of either of them because their interests were not fully aligned; and (3) one client could have disclosed confidential information detrimental to the interests of other client. (Plaintiffs' Proposed Findings at 13).

New York's ethical rules prohibit an attorney from "accept[ing] representation of a person whose interests are opposed to the client." In re Agent Orange Prod. Liability Litig., 800 F.2d 14, 17 (2d Cir. 1986); see also N.Y Comp. Codes R. & Regs. tit. 22, § 1200.24 (prohibiting

simultaneous representation when "the exercise of professional judgment in behalf of a client will be or is likely to be adversely affected by [the simultaneous representation] or if it would be likely to involve the lawyer in representing differing interests"), superseded in 2009 by N.Y Comp. Codes R. & Regs. tit. 22, § 1200.0, Rule 1.7(a) ("[A] lawyer shall not represent a client if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests.").

Alvis Brown's interests were not adverse to Farb's; indeed, he testified on her behalf at trial. Concurrent representation of a party and a non-party witness constitutes a conflict of interest only if the witness is expected to give testimony adverse to the client. See Ritchie v. Gano, No. 07 Civ. 7269, 2008 WL 4178152, at *10 n.5 (S.D.N.Y. Sept. 8, 2008) (collecting cases); see also George v. City of Buffalo, — F. Supp. 2d —, 2011 WL 2259690, at *16 (W.D.N.Y. June 3, 2011) ("In the case of representation of a non-party witness and a party, disqualification . . . occurs where . . . the attorney . . . suffers from an actual conflict based on the witness's expected testimony adverse to an attorney's client such that the attorney's duty of loyalty and zealous representation to the client and witness is thereby impaired."). Alvis Brown had no incentive to testify in a way that was adverse to Farb's interests. He was not a party to the case and thus had no need to defend himself. The original Complaint asserts that James Brown, not Alvis Brown, created a hostile work environment. (See Exh. 12 at 10). Alvis Brown's alleged participation consisted only of witnessing instances of inappropriate behavior by James Brown, and being victimized by Principal Brown's "effort[s] to cause conflict between Farb and Alvis Brown." (See id. at 6, 7, 9-10, 11). As such, he could only be expected to corroborate Farb's allegations. Plaintiffs assert that, because he represented both Alvis Brown and Farb, Liotti would not be able to "point out that, as a Dean of Students, [Alvis]

Brown may have had an obligation to report to the proper School Board authorities any improprieties he observed on the part of principal James Brown." (Plaintiffs' Proposed Findings at 13). However, they fail to point out how Alvis Brown's hypothesized failure would be relevant to Farb's discrimination, infliction of emotional distress, or tortious interference claims.

This is not the kind of situation in which New York courts have found a conflict of interest based on simultaneous representation. Those cases tend to involve circumstances in which one client might assert a claim against the other client or in which recovery of one client is at the expense of recovery of another. For example, in Ferrara v. Jordache Enters. Inc., 819 N.Y.S.2d 421 (N.Y. Sup. Ct. 2006), the court disqualified an attorney from representing both the driver of a bus that was in an traffic accident and the matron on the bus. The court noted that dual driver-passenger representation is prohibited because it is likely that the passenger will interpose counterclaims against the driver, thus pitting the two clients against each other. See id. at 771. Here, however, Farb asserted no claim against Alvis Brown, nor did he against her. Indeed, there was no place for a claim against Alvis Brown in her suit, which complained only about conduct of her supervisors. (Tr. 212). Nor would Farb's recovery in her suit limit Alvis Brown's potential for recovery in his. Indeed, Farb and Alvis Brown each recovered damages against the School District. In short, it was in the mutual interest of each to support one another's claims.

Finally, plaintiffs have not identified any confidences revealed by either client that adversely affected the other. See Cardinale v. Golinello, 43 N.Y.2d 288, 295 (1977); see also Muriel Seibert & Co. v. Intuit Inc., 820 N.Y.S.2d 54, 55 (App. Div. 2006) (noting that the party charging an attorney with disclosure of confidential information must identify the specific confidential information imparted to the attorney). Therefore, Liotti's representation of both Farb and Alvis Brown does not

constitute good cause for termination.

IV.    Liotti Has Not Demonstrated Spoliation

Liotti asserts in his papers that plaintiffs spoliated evidence when they took Liotti's case file on the Farb matter. (See Liotti's Proposed Findings at 7; Reply at 5-6). Specifically, he asserts that the "integrity" of the file was lost when it was removed by Newman without consent and later was turned over to trial counsel Ostrove and "spread throughout approximately five (5) trunk boxes of documents." (Reply at 5; see also Liotti's Proposed Findings at 7). He asks that the Court infer from such conduct that the file would have assisted him in meeting his burden of proof.[11] (Reply at 5).

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks omitted). To establish a spoliation claim a party must show "(1) that 'the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed'; (2) that the evidence was 'destroyed with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense." Centrifugal Force, Inc. v. Softnet Comm'n, Inc., — F. Supp. 2d —, 2011 WL 1792047, at *2 (May 11, 2011) (quoting Byrnie, 243 F.3d at 107–09).

Liotti has failed to establish that evidence was spoliated. Liotti complains merely that the integrity of his file was compromised. (See, e.g., Tr. 93). Although in previous submissions to the

_____

[11]In an earlier submission, Liotti suggested that a preclusion order should be entered as a sanction for the alleged spoliation. See Letter to Magistrate Judge E. Thomas Boyle dated February 7, 2011 ("Feb. 7, 2011 Letter"), at 1, Farb v. Baldwin Union Free School Dist., No. 05-CV-0596 (Feb. 7, 2011), ECF No. 207. He did not, however, identify what was to be precluded from the hearing regarding his asserted right to attorneys' fees.

Court he has suggested that parts of the file may have been destroyed (see Feb. 7, 2011 Letter at 1 ("The improper withholding of a copy of my file and the damage done to its integrity, including its mutilation, dismemberment and/or destruction severely prejudice me . . . .")), he no longer seems to be asserting that claim. In any event, even if he continued to assert that parts of the file were destroyed or altered, he has not proved this allegation. Rather, it is clear that he declined the opportunity to inspect the five boxes in the possession of plaintiffs' trial counsel, Ostrove, among which his papers were apparently spread. (Tr. 93; see also Liotti's Proposed Findings at 7; Reply at 5). Moreover, Liotti has neither alleged nor shown that any putative destruction was accomplished "with a culpable state of mind." Thus, other than Liotti's conclusory assertions, there is nothing before the Court that would support a finding that plaintiffs spoliated evidence. Lastly, there is no evidence that the records in Liotti's file would be any assistance to him on the issue of termination for cause involving Ansell. Accordingly, there is no showing of prejudice.

CONCLUSION

For the foregoing reasons, Thomas F. Liotti's Motion for Attorneys' Fees is DENIED. Liotti's request for sanctions, based on plaintiffs' opposition of his application, is also DENIED.

**SO ORDERED:**

Dated: Central Islip, New York
        September 26, 2011

                                        /s/ E. Thomas Boyle
                                        E. THOMAS BOYLE
                                        United States Magistrate Judge